**BRODSKY SMITH**
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9465 Wilshire Boulevard, Suite 300
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (310) 247-0160

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOAQUIN ALCANTAR,<br><br>                    Plaintiff,<br><br>         vs.<br><br>INFINERA CORPORATION, GEORGE A. RIEDEL, CHRISTINE B. BUCKLIN, GREGORY P. DOUGHERTY, DAVID W. HEARD, SHARON E. HOLT, ROOP K. LAKKARAJU, PAUL J. MILBURY, AMY H. RICE, and DAVID F. WELCH,<br><br>                    Defendants. | Case No.:  5:24-cv-5979<br><br>**Complaint For:**<br><br>(1) Violation of § 14 (a) of the Securities Exchange Act of 1934<br>(2) Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Joaquin Alcantar ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1. Plaintiff brings this stockholder action against Infinera Corporation ("Infinera" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual Defendants," and collectively with the Company, the "Defendants"), for violations of Sections

14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a result of Defendants' efforts to merge with Nokia Corporation ("Parent"), through merger vehicle Neptune of America Corporation ("Merger Sub," and together with Parent, "Nokia") as a result of an unfair process, and to enjoin an upcoming stockholder vote on a proposed merger transaction (the "Proposed Transaction").

2. The terms of the Proposed Transaction were memorialized in a June 28, 2024, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, each issued and outstanding share of Infinera's common stock ("Company Common Stock"), will be automatically cancelled, extinguished and converted into the right to receive one of the following: (i) cash in an amount equal to $6.65, without interest ("Cash Consideration"); (ii) 1.7896 American Depository Shares ("Nokia ADSs") (each representing a beneficial interest in one ordinary share, with no nominal value of Nokia ("Nokia Shares")) (the "Share Consideration"); or (iii) cash in an amount equal to $4.66, without interest, and 0.5355 Nokia ADSs (the "Mixed Consideration," and together with the Cash Consideration and the Share Consideration, the "Merger Consideration").

3. On August 1, 2024, Nokia filed a Form F-4 attaching the Registration Statement with the SEC in support of the Proposed Transaction. Thereafter, on August 16, 2024, Nokia filed an Amended Registration Statement (together, the "Registration Statement").

4. The Proposed Transaction is unfair for a number of reasons. Significantly, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits. For example: certain Company executives are entitled to severance packages, often referred to as "golden parachute" packages, entitling same to millions of dollars not shared by Plaintiff and other Company common stockholders.

5. The Registration Statement is materially deficient, depriving Plaintiff of the information necessary to make an intelligent, informed, and rational decision of whether to vote

in favor of the Proposed Transaction, and is thus, in violation of the Exchange Act. As detailed below, the Registration Statement omits and misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Infinera and Nokia, provided by Infinera management and Nokia management respectively, to the Board, the Strategic Committee of the Infinera Board (the "Strategic Committee"), and the Company's financial advisor Centerview Partners LLC ("Centerview"); and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinion created by Centerview, and provided to the Board and the Strategic Committee.

6. Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff. This action seeks to enjoin the Proposed Transaction.

**PARTIES**

7. Plaintiff is a citizen of California and, at all times relevant hereto, has been an Infinera stockholder.

8. Defendant Infinera manufactures semiconductors, and supplies networking equipment, optical semiconductors, software, and services worldwide. The Company is incorporated in Delaware and has its principal place of business at 36373 San Ignacio Avenue, San Jose, CA 95119. Shares of Infinera common stock are traded on the NASDAQ Stock Exchange under the symbol "INFN."

9. Defendant George A. Riedel ("Riedel") has been Chairman of the Company Board of Directors at all relevant times.

10. Defendant Christine B. Bucklin ("Bucklin") has been a director of the Company at all relevant times.

11. Defendant Gregory P. Dougherty ("Dougherty") has been a director of the Company at all relevant times.

12. Defendant David W. Heard ("Heard") has been a director of the Company at all relevant times. In addition, Defendant Heard serves as the Company's Chief Executive Officer ("CEO").

13. Defendant Sharon E. Holt ("Repo") has been a director of the Company at all relevant times.

14. Defendant Roop K. Lakkaraju ("Lakkaraju") has been a director of the Company at all relevant times.

15. Defendant Paul J. Milbury ("Milbury") has been a director of the Company at all relevant times.

16. Defendant Amy H. Rice ("Rice") has been a director of the Company at all relevant times.

17. Defendant David F. Welch ("Welch") has been a director of the Company at all relevant times. In addition, Defendant Welch is the Company's Founder.

18. Defendants identified in ¶¶ 9 - 17 are collectively referred to as the "Individual Defendants."

19. Non-Party Nokia provides mobile, fixed, and cloud network solutions worldwide.

20. Non-Party Merger Sub is a wholly owned subsidiary of Nokia created to effectuate the Proposed Transaction.

**JURISDICTION AND VENUE**

21. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have. The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

22. Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as

to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company maintains its headquarters in this District.

**SUBSTANTIVE ALLEGATIONS**

*The Flawed Sales Process*

24. Infinera manufactures semiconductors, and supplies networking equipment, optical semiconductors, software, and services worldwide.

25. As detailed in the Registration Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed to effectuate a sale of the Company to Nokia.

26. The Registration Statement fails to disclose why the Company would agree to a Proposed Transaction in which certain Company stockholders will be fully cashed out, while a limited number of Company stockholders will be able to roll their investment into Nokia. All Company stockholders should be entitled to the same Merger Consideration.

27. Additionally, the Registration Statement is silent as to the nature of the confidentiality agreement entered into between the Company and Nokia, whether this agreement differed from any other agreement with potentially interested third parties not specifically mentioned by the Registration Statement, if so in all specific manners.

28. The Registration Statement fails to adequately disclose any and all communications regarding post-transaction employment during the negotiation of the underlying transaction.

29. It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

*The Proposed Transaction*

30.     On June 27, 2024, Infinera and Nokia issued a press release announcing the Proposed Transaction. The press release states, in relevant part:

> **Espoo, Finland and San Jose, California, USA –** Nokia (NYSE: NOK) and Infinera (NASDAQ: INFN), a global supplier of innovative open optical networking solutions and advanced optical semiconductors, today announced a definitive agreement under which Nokia will acquire Infinera in a transaction valuing the company at $6.65 per share or an enterprise value of US$ 2.3 billion. The transaction represents a premium of 28% to Infinera's share price at the close of 26 June 2024 and a 37% premium to the trailing 180-day volume weighted average price (VWAP). At least 70% of the consideration will be paid in cash and Infinera's shareholders can elect to receive up to 30% of the aggregate consideration in the form of Nokia ADSs. Nokia's Board of Directors has committed to increase and accelerate Nokia's share buyback program to offset the dilution from the deal.
>
> Nokia and Infinera see a significant opportunity in merging to improve scale and profitability, enabling the combined business to accelerate the development of new products and solutions to benefit customers. The transaction aligns strongly with Nokia's strategy, as it is expected to strengthen the company's technology leadership in optical and increase exposure to webscale customers, the fastest growing segment of the market.
>
> Nokia believes the transaction has compelling financial and strategic merit. The combination with Infinera is projected to accelerate Nokia's journey to a double-digit operating margin in its Optical Networks business. Nokia targets to achieve EUR 200 million of net comparable operating profit synergies by 2027*. This transaction along with the recently announced sale of Submarine Networks will create a reshaped Network Infrastructure built on three strong pillars of Fixed Networks, IP Networks and Optical Networks. Nokia targets mid-single digit organic growth for the overall Network Infrastructure business and to improve its operating margin to mid-to-high teens level.
>
> The transaction is expected to be accretive to Nokia's comparable EPS in the first year post close and to deliver over 10% comparable EPS accretion by 2027*, with a return on invested capital (RoIC) comfortably above Nokia's weighted average cost of capital (WACC).
>
> **Pekka Lundmark, President and CEO of Nokia, said**: "In 2021 we increased our organic investment in Optical Networks with a view to improving our competitiveness. That decision has paid off and has delivered improved customer recognition, strong sales growth and increased profitability. We believe now is the right time to take a compelling inorganic step to further expand Nokia's scale in optical networks. The combined businesses have a strong strategic fit given their

- 6 -
COMPLAINT

highly complementary customer, geographic and technology profiles. With the opportunity to deliver over 10% comparable EPS accretion, we believe this will create significant value for shareholders."

**Federico Guillén, President of Network Infrastructure at Nokia, said**: "Today, Network Infrastructure offers a unique portfolio across the fixed access, optical and IP networks domains built on leading technology innovation and a strong customer focus. This acquisition will further strengthen the optical pillar of our business, expand our growth opportunities across all our target customer segments and improve our operating margin. I am extremely pleased that we are bringing together these two talented and dedicated teams. Separately, we have long respected each other as competitors. Together, we find the logic of combination irresistible."

**David Heard, CEO of Infinera, said**: "We are really excited about the value this combination will bring to our global customers. We believe Nokia is an excellent partner and together we will have greater scale and deeper resources to set the pace of innovation and address rapidly changing customer needs at a time when optics are more important than ever – across telecom networks, inter-data center applications, and now inside the data center. This combination will further leverage our vertically integrated optical semiconductor technologies. Furthermore, our stakeholders will have the opportunity to participate in the upside of a global leader in optical networking solutions."

**Compelling strategic benefits for Nokia, Infinera and customers**

- **Improving global scale and product roadmap**: The combination will increase the scale of Nokia's Optical Networks business by 75%, enabling it to accelerate its product roadmap timeline and breadth; providing better products for customers and creating a business that can sustainably challenge the competition.

- **The combined business will have significant in-house capabilities**, including an expanded digital signal processor (DSP) development team, expertise across silicon photonics and indium phosphide-based semiconductor material sciences, and deeper competency in photonic integrated circuit (PIC) technology. The result will be a strong innovative player with a deep and diverse pool of optical networking talent and expertise.

- **Gaining scale in North America optical market**: The two companies have limited customer overlap, putting the combined business in a strong position in all regions (excluding China). Infinera has built a solid presence in the North America optical market, representing ~60% of its sales, which will improve Nokia's optical scale in the region and complement Nokia's strong positions in APAC, EMEA and Latin America.

- **Building on Nokia's commitment to investment in US-based** manufacturing and advanced testing and packaging capabilities.


- **Accelerating Nokia's expansion into enterprise and particularly webscale**: The combination of these two businesses is also expected to accelerate Nokia's strategic goal of diversifying its customer base and growing in enterprise. Internet content providers (ICP or webscale as Nokia typically calls this segment) make up over 30% of Infinera's sales. With recent wins in line systems and pluggables, Infinera is well established in this fast-growing market. Infinera has also recently been developing high-speed and low-power optical components for use in intra-data center (ICE-D) applications and which are particularly suited to AI workloads which can become a very attractive long-term growth opportunity. Overall, the acquisition offers an opportunity for a step change in Nokia's penetration into webscale customers.

- **Net comparable operating profit synergies of EUR 200 million**: The combination is expected to deliver EUR 200 million of net comparable operating profit synergies by 2027*. Approximately one third of the synergies are expected to come from cost of sales due to supply chain efficiencies and the remainder from operating expenses due to portfolio optimization and integration along with reduced product engineering costs and standalone entity costs. Nokia expects one-time integration costs of approximately EUR 200 million related to the transaction.

- **Creating value for shareholders**: The transaction is expected to be accretive to Nokia's comparable operating profit and EPS in year 1 and to deliver more than 10% comparable EPS accretion in 2027*. Nokia also expects the deal to deliver a return on invested capital (RoIC) comfortably above Nokia's weighted average cost of capital (WACC). In addition, Infinera's investors will have the opportunity to participate in the exciting upside of investing in a global leader in optical networking solutions.

**Transaction details**

Under the terms of the definitive agreement, Nokia is acquiring Infinera for $6.65 per share, which equates to an enterprise value of $2.3 billion. For each Infinera share, Infinera shareholders will be able to elect to receive either: 1) $6.65 cash, 2) 1.7896 Nokia shares, or 3) a combination of $4.66 in cash and 0.5355 Nokia shares for each Infinera share. All Nokia shares will be issued in the form of American Depositary Shares. The definitive agreement includes a proration mechanism so that the Nokia shares issued in the transaction do not exceed an amount equal to approximately 30% of the aggregate consideration that may be paid to Infinera shareholders.

In conjunction with this transaction, Nokia's Board of Directors has committed to increasing and accelerating Nokia's on-going share buyback program to mitigate any dilution from the equity component of the acquisition. This will be in addition to Nokia's on-going EUR 600 million buyback program.


- 8 -
COMPLAINT

At or around the time of closing of the transaction Nokia will repurchase Infinera's outstanding convertible notes for an estimated total value of approximately US$760 million including estimated change of control costs which is already considered in the previously mentioned US$2.3 billion enterprise value.

The acquisition has been unanimously approved by the board of directors of both Nokia and Infinera. It is targeted to close during the first half of 2025, subject to approval by Infinera's shareholders, regulatory approvals including antitrust, CFIUS and other foreign direct investment approvals and other customary closing conditions.

Oaktree Optical Holdings, L.P., which owned approximately 11% of Infinera common stock as of 27 June 2024, has agreed to vote their shares in favor of the transaction.

*References to the 2027 timeline for net operating profit synergies and EPS accretion are based on the transaction closing during the first half of 2025. Any delay to the closing of the transaction could impact the timing of realizing the targeted synergies.*

**Potential Conflicts of Interest**

31. The breakdown of the benefits of the deal indicates that Infinera insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Infinera.

32. For example, Company insiders currently own company options, and other equity awards, all of which will be subject to accelerated vesting upon the consummation of the Proposed Transaction, and converted into the Merger Consideration not shared with public Company stockholders such as Plaintiff upon the consummation of the Proposed Transaction as follows:

| Name | Shares of Infinera Common Stock (#)[1] | Shares of Infinera Common Stock ($)[1] | Infinera RSUs (#)[2] | Infinera RSUs ($)[2] | Infinera PSUs (#)[3] | Infinera PSUs ($)[3] | Total |
|---|---|---|---|---|---|---|---|
| Christine B. Bucklin | 135,019 | 831,987 | 36,697 | 244,035 | — | — | 1,076,022 |
| Gregory P. Dougherty | 216,621 | 1,334,819 | 36,697 | 244,035 | — | — | 1,578,854 |
| Sharon E. Holt | 232,174 | 1,430,656 | 36,697 | 244,035 | — | — | 1,674,691 |
| Roop K. Lakkaraju[4] | 87,676 | 540,260 | 43,175 | 287,114 | — | — | 827,373 |
| Paul J. Milbury | 192,931 | 1,188,841 | 36,697 | 244,035 | — | — | 1,432,876 |

| Name | | | | | | | |
|---|---|---|---|---|---|---|---|
| Amy H. Rice[5] | — | — | — | — | — | — | — |
| George A. Riedel | 168,019 | 1,035,333 | 36,697 | 244,035 | — | — | 1,279,368 |
| David F. Welch, Ph. D.[6] | 409,341 | 2,522,359 | 250,000 | 1,540,500 | — | — | 4,062,859 |
| David W. Heard[7] | 1,026,317 | 6,324,165 | 665,276 | 4,099,431 | 1,226,666 | 8,157,329 | 18,580,925 |
| Nancy L. Erba[7] | 555,737 | 3,424,451 | 206,459 | 1,272,200 | 315,000 | 2,094,750 | 6,791,40 |
| Regan MacPherson[7] | — | — | 115,000 | 708,630 | 115,000 | 764,750 | 1,473,380 |
| Nicholas R. Walden[7] | 154,577 | 952,503 | 131,834 | 812,361 | 201,500 | 1,339,975 | 3,104,840 |
| David L. Teichmann[7] | 297,413 | 1,832,659 | 102,084 | 629,042 | 112,500 | 748,125 | 3,209,826 |

33.     In addition, employment agreements with certain Infinera executives entitle such executives to severance packages should their employment be terminated under certain circumstances. These 'golden parachute' packages are significant and will grant each director or officer entitled to them millions of dollars, compensation not shared by Plaintiff as follows:

**Golden Parachute Compensation**

| Name | Cash ($)[1] | Equity ($)[2] | Perquisites/ Benefits ($)[3] | Total ($)[4] |
|---|---|---|---|---|
| David W. Heard | 3,411,000 | 12,028,620 | 85,105 | 15,524,725 |
| Nancy L. Erba | 1,425,000 | 3,315,710 | 36,629 | 4,777,340 |
| Nicholas R. Walden[5] | 1,290,000 | 2,116,956 | 9,483 | 3,416,439 |
| David L. Teichmann | 1,168,125 | 1,377,167 | 49,973 | 2,595,265 |

34.     The Registration Statement also fails to adequately disclose communications regarding post-transaction employment, if any, which took place during the negotiation of the underlying transaction. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.

35.     This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

36. Thus, while the Proposed Transaction is not in the best interests of Infinera, Plaintiff or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Registration Statement***

37. The Infinera Board caused to be filed with the SEC a materially misleading and incomplete Registration Statement that, in violation the Exchange Act, failed to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

38. Specifically, the Registration Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Registration Statement fails to disclose:

   a. Why the Company would agree to a Proposed Transaction in which certain Company stockholders will be fully cashed out, while a limited number of Company stockholders will be able to roll their investment into Nokia. All Company stockholders should be entitled to the same Merger Consideration;

   b. Whether the terms of any confidentiality agreements entered during the sales process between Company on the one hand, and any other third party (including Nokia), if any, differed from one another, and if so, in all specific manners; and

   c. Adequate and complete disclosure of communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.

*Omissions and/or Material Misrepresentations Concerning Infinera and Nokia Financial Projections*

39. The Registration Statement fails to provide material information concerning financial projections for Infinera provided by Infinera management to the Board and Centerview and relied upon by Centerview in its fairness opinion. The Registration Statement discloses management-prepared financial projections for the Company which are materially misleading.

40. Notably the Registration Statement reveals that as part of its analyses, Centerview reviewed, "certain internal information relating to the business, operations, earnings, cash flow, assets, liabilities and prospects of Infinera, including certain financial forecasts, analyses and projections relating to Infinera prepared by management of Infinera and furnished to Centerview by Infinera for purposes of Centerview's analysis, which are referred to in this summary of Centerview's opinion as the 'Infinera Forecasts,' and which are collectively referred to in this summary of Centerview's opinion as the 'Infinera Internal Data.'"

41. The Registration Statement should have, but fails to provide, certain information in the projections that Infinera management provided to the Board and Centerview. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

42. With regards to *Certain Projected Financial Information*, the Registration Statement fails to disclose material line items, including the following:

   a. Total Revenue, including the underlying inputs, metrics, and assumptions used to determine the same; and

   b. Non-GAAP Net Operating Profit After Tax, including the underlying inputs, metrics, and assumptions used to determine the same.

43. The Registration Statement also fails to provide a reconciliation of all Non-GAAP metrics to GAAP.

44. The Registration Statement fails to provide any financial projections for Nokia even though the Registration Statement states that Centerview reviewed, "certain internal information relating to the business, operations, earnings, cash flow, assets, liabilities and prospects of Nokia, which are collectively referred to in this summary of Centerview's opinion as the "Nokia Internal Data.""

45. This information is necessary to provide Plaintiff, in his capacity as a Company stockholder, with a complete and accurate picture of the sales process and its fairness. Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

46. Without accurate projection data for Infinera being presented in the Registration Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of the Centerview's fairness opinion, or make an informed decision whether to vote in favor of the Proposed Transaction. As such, the Board has violated the Exchange Act by failing to include such information in the Registration Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Centerview*

47. In the Registration Statement, Centerview describes its fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

48. With regard to Centerview's *Selected Public Companies Trading Analysis*, the Registration Statement fails to disclose material line items, including the following:

    a. The enterprise value ("EV") for each of the selected companies analyzed;

    b. The inputs, metrics, and assumptions used to determine the EV/ Adjusted EBITDA Multiple applied to each selected company;

    c. The inputs, metrics, and assumptions used to determine the Price/ Adjusted EPS

|   |   |
|---|---|
| 1 | Multiple applied to each selected company; |
| 2 | d. The inputs, metrics, and assumptions used to determine the EV/ Adjusted EBITDA Multiples range of 8.5x to 10.5x utilized; |
| 4 | e. The inputs, metrics, and assumptions used to determine the Price/ Adjusted EPS Multiples range of 13.0x to 15.5x utilized; and |
| 6 | f. The number of fully diluted shares of Company Common Stock outstanding as of June 26, 2024. |

49. With regard to Centerview's *Selected Transactions Analysis*, the Registration Statement fails to disclose material line items, including the following:

    a. The date on which each selected transaction closed;

    b. The aggregate value of each selected transaction;

    c. The inputs, metrics, and assumptions used to determine the EV/ LTM Adjusted EBITDA Multiple applied to each selected transaction;

    d. The inputs, metrics, and assumptions used to determine the EV/ LTM Adjusted EBITDA 25th Percentile, Mean, Median, and 75th Percentile Multiples utilized;

    e. The inputs, metrics, and assumptions used to determine the EV/ LTM Adjusted EBITDA Multiples reference range of 10.0x to 12.0x utilized; and

    f. The number of fully diluted shares of Company Common Stock outstanding as of June 26, 2024.

50. With regard to Centerview's *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose material line items, including the following:

    a. The Company's terminal value utilized;

    b. The inputs, metrics, and assumptions used to determine the perpetuity growth rates ranging from 1.0% to 3.0% utilized;

    c. The inputs, metrics, and assumptions used to determine the discount rates ranging from 12.0% to 14.50% utilized; and

    d. The Company's weighted average cost of capital utilized.

51. With regard to Centerview's *Analyst Price Targets Analysis,* the Registration Statement fails to disclose:

    a. The specific price targets analyzed; and

    b. The specific Wall Street firms that generated the analyzed price targets.

52. The Registration Statement fails to provide any and all, if any, analyses relating to Nokia's business done by Centerview and provided to Company and Nokia.

53. The Registration Statement fails to provide any and all analyses done by Nokia's financial advisor, if any were produced.

54. These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

55. Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes her value and serves her interest as a stockholder. Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in her best interests as a public Infinera stockholder. As such, the Board has violated the Exchange Act by failing to include such information in the Registration Statement.

## FIRST COUNT

### Violations of Section 14(a) of the Exchange Act

### (Against All Defendants)

56. Plaintiff repeats all previous allegations as if set forth in full herein.

57. Defendants have disseminated the Registration Statement with the intention of soliciting stockholders, including Plaintiff, to vote in favor of the Proposed Transaction.

58. Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction. Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities

exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

59. As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

60. The Registration Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

61. The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

62. The Individual Defendants were at least negligent in filing a Registration Statement that was materially misleading and/or omitted material facts necessary to make the Registration Statement not misleading.

63. The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to vote his shares in

favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

### SECOND COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants)

64. Plaintiff repeats all previous allegations as if set forth in full herein.

65. The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the Registration Statement was materially misleading to Plaintiff in his capacity as a Company stockholder.

66. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Registration Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the Registration Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Registration Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

67. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Infinera's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being

concealed from Plaintiff and Company, and that the Registration Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Registration Statement and are therefore responsible and liable for the misrepresentations contained herein.

68. The Individual Defendants acted as controlling persons of Infinera within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Infinera to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Infinera and all of its employees. As alleged above, Infinera is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and against the Defendants, as follows:

A. Enjoining the Proposed Transaction;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C. Directing the Individual Defendants to exercise their fiduciary duties to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: August 26, 2024  **BRODSKY SMITH**

By: *Evan J. Smith*
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9465 Wilshire Blvd., Ste. 300
Phone: (877) 534-2590
Facsimile (310) 247-0160

*Attorneys for Plaintiff*